304 Ga. 250
FINAL COPY

S18A0595. STRIBLING v. THE STATE.

PETERSON, Justice.

Bobby Rex Stribling, Jr., appeals his convictions for malice murder and other crimes arising from the fatal beating of William Glenn Thomas, Jr.[1] Thomas was placed in a medically induced coma and on a ventilator as a result of the beating, but was taken off the ventilator when his condition failed to improve. On appeal, Stribling's sole argument is that the evidence was insufficient to convict him, because there was evidence that Thomas might have survived had life support not been withdrawn, and thus the withdrawal of life support was the intervening and ultimate cause of Thomas's death. But the trial

---

[1] Thomas died on July 9, 2007. On July 20, 2007, a Wayne County grand jury indicted Stribling for malice murder, aggravated battery, aggravated assault with intent to rob, armed robbery, burglary, and theft by taking. Following a jury trial held from August 16 through September 4, 2010, the jury found Stribling guilty of all charges. The trial court sentenced Stribling to life without parole for malice murder, consecutive twenty-year terms for aggravated battery and aggravated assault, a consecutive life sentence for armed robbery, a twenty-year term for burglary consecutive to the armed robbery sentence, and a consecutive ten-year term for theft by taking. On January 4, 2017, the trial court denied Stribling's motion for new trial, as amended. Stribling filed a timely notice of appeal, and his case was docketed to this Court's April 2018 term and submitted for a decision on the briefs.

evidence authorized the jury to conclude that Thomas did not have a realistic chance of survival and that Stribling's actions were the proximate cause of Thomas's death. Therefore, we affirm Stribling's murder conviction, but vacate several sentences on convictions that should have merged.

Viewed in the light most favorable to the verdicts, the trial evidence showed the following. Thomas, a former district attorney who was a lawyer in private practice at the time of his death, had lunch with his two daughters on June 25, 2007. After lunch, Thomas returned to his office and met with a client. That client, Don Thomas, saw Stribling walking near the building carrying a brown paper bag before Don entered. Stribling was waiting outside when Don left the building and asked Don whether anyone else was inside the building; Don replied that Thomas was alone.

Sometime later, George Cappleman, who shared the office building with Thomas, arrived at the building. Cappleman did not think Thomas was at the office because Cappleman did not see Thomas's truck parked outside. When Cappleman entered the office, he saw Thomas sitting at his desk, bleeding from his head with a large bruise under his left eye. Thomas was talking, but was very confused. Cappleman called 911.

Paramedics observed large lacerations and massive head trauma to the top of Thomas's head. Thomas was taken to a local hospital and then flown to one in Savannah. Once there, medical staff induced a coma to help reduce the swelling of Thomas's brain and placed Thomas on a ventilator, but his condition never improved. After two weeks, Thomas's family directed doctors to remove Thomas from the ventilator after being told that Thomas was "basically brain dead" and that he would likely develop pneumonia. Thomas died quickly after the ventilator was removed. An autopsy revealed that Thomas had suffered at least 15 separate blows resulting in 38 different injuries, including a fractured skull. The cause of death was identified as multiple blunt force injuries.

One day after Thomas was beaten, police officers saw someone driving Thomas's missing truck and initiated a traffic stop. Two men had given the truck and money to the passenger in exchange for crack cocaine; police determined one of the men was Stribling. Police located Stribling at a motel and arrested him. During a search of Stribling's motel room, police recovered several items belonging to Thomas, including a driver's license, a district attorney's badge, and a check made out to Thomas. After being advised of his rights, Stribling confessed to attacking Thomas. Stribling said Thomas represented him in a

criminal case and he went to Thomas's office to ask for money. When Thomas refused, Stribling "snapped" and struck Thomas three to four times with something off of Thomas's desk. Stribling also said that, after striking Thomas, he reached into Thomas's pockets and grabbed Thomas's wallet, over $1,000 in cash, and the keys to Thomas's truck; he then fled in Thomas's truck.

1. On appeal, Stribling concedes that the injuries that he admitted to inflicting caused Thomas to be hospitalized and placed on life support. Citing testimony from the medical examiner, Stribling argues that, notwithstanding the severity of Thomas's injuries, there was a possibility that Thomas could have survived had he remained on life support longer. Specifically, Stribling cites the following exchange on direct examination:

> MEDICAL EXAMINER: Oftentimes, the brain is dead but the body is still working and the body, technically, isn't dead because they haven't declared brain death; there may be some electrical activity. But what is there is not the person that was.
> PROSECUTOR: Can you make any — do you have any opinions as to that operation in this particular case?
> MEDICAL EXAMINER: I can only tell you that he sustained very, very, very significant injuries. A finding of air in the brain tissue itself is very unusual and that's directly related to the laceration with the skull fracture underneath and air getting in via that channel. I can't tell you a specific percentage of cases like that where the individual dies because that would be an isolated injury, if you were just studying patients who had a lacerated skull fracture. Well, that

4

is not what happened to Mr. Thomas. In addition to that one injury, he had at least 37 other separate injuries that I documented. I would say that he would be fortunate to survive the initial event but he could have. And in fact, in this case, he wasn't declared dead for several days later. But, he was fortunate enough to not have died within a short period of time after the initial attack.

PROSECUTOR: Would it be possible for him to regain consciousness and some of his motor skills?

MEDICAL EXAMINER: That would be possible. Again, depending on the treatment and precise areas of the brain and how much damage had been done by that initial attack.

Stribling also cites the following exchange during cross-examination of the medical examiner:

DEFENSE COUNSEL: Doctor, I believe, you did testify that it is possible to survive this.

MEDICAL EXAMINER: It would be theoretically possible to survive, depending on what you call surviving.

DEFENSE COUNSEL: Well, would the age of the person have anything to do with it?

MEDICAL EXAMINER: That would be one factor that would help determine possible survival and again, depending on how you define survival. If you define survival as returning to your base line status, I can't tell you that that could have happened. I can tell you that an older patient is not going to fa[re] as well as a younger patient, in general.

Stribling argues that the medical examiner's testimony established the possibility that Thomas could have survived had life support continued, although perhaps not with the same quality of life, and that the removal of Thomas from life support was the intervening and ultimate cause of his death. We disagree.

5

"A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). The element of causation is determined under the proximate cause standard. State v. Jackson, 287 Ga. 646, 649 (2) (697 SE2d 757) (2010).

> Where one inflicts an unlawful injury, such injury is to be accounted as the efficient, proximate cause of death, whenever it shall be made to appear, either that (1) the injury itself constituted the sole proximate cause of the death; or that (2) the injury directly and materially contributed to the happening of a subsequent accruing immediate cause of the death; or that (3) the injury materially accelerated the death, although proximately occasioned by a pre-existing cause.

Wilson v. State, 190 Ga. 824, 829 (2) (10 SE2d 861) (1940). Proximate cause thus imposes liability for the reasonably foreseeable results of a criminal act if there is no independent and unforeseen intervening cause. Franklin v. State, 295 Ga. 204, 205 (1) (a) (758 SE2d 813) (2014). What constitutes proximate cause is "undeniably a jury question." Robinson v. State, 298 Ga. 455, 458 (1) (782 SE2d 657) (2016) (citation and punctuation omitted).

Under this standard, the jury was authorized to conclude that Stribling's actions were the proximate cause of Thomas's death. There is no dispute that

6

Stribling caused Thomas's severe brain injuries, which required the use of life support to attempt recovery and to reduce brain swelling. It was reasonably foreseeable that Thomas would be taken off life support when his condition failed to improve and when, according to the doctor's statements to Thomas's family, Thomas was "basically brain dead" and would likely develop pneumonia. See Franklin, 295 Ga. at 205 (1) (a) ("[T]he dislodgement of the tracheal tube was not an unforseen intervening cause of the victim's death because the beating placed the victim in a chronic vegetative state necessitating the placement of the tracheal tube. As such, the dislodging of the tracheal tube was only secondary to the beating which was the proximate cause of death."); see also Singley v. State, 198 Ga. 212, 214-215 (1) (31 SE2d 349) (1944) (wound inflicted by defendants was proximate cause of injury even though victim died of pneumonia because victim's injuries left him susceptible to illness).

Although Thomas points to the medical examiner's testimony that it was theoretically possible for Thomas to survive his injuries, the medical examiner was quick to note that he could not opine as to whether Thomas would have survived and that Thomas, as an older patient, would have had great difficulty in that regard. Because the possibility of survival was speculative at best, the jury

7

was authorized to reject that possibility as unreasonable. See Shields v. State, 285 Ga. 372, 375 (1) (677 SE2d 100) (2009) ("[T]he jury was authorized to reject as unreasonable possibilities which were only theoretical[.]"). The evidence was sufficient for the jury to conclude that Stribling's beating of Thomas proximately caused his death.

2. Although not raised by either party, we recognize merger errors in Stribling's sentencing. See Smith v. State, 298 Ga. 406, 415 (4) (782 SE2d 269) (2016) (merger errors may be corrected on appeal even if not raised by the parties). As set out in footnote 1 above, Stribling was sentenced on every count of which he was found guilty — malice murder, aggravated battery, aggravated assault with intent to rob, armed robbery, burglary, and theft by taking. But some of these charges should have merged with others. There is no evidence that the aggravated battery occurred independently from the act that caused Thomas's death, and so this count should have merged with the malice murder conviction. See Sullivan v. State, 301 Ga. 37, 43 (3) (799 SE2d 163) (2017). And the aggravated assault with intent to rob should have merged with armed robbery. See Douglas v. State, 303 Ga. 178, 183 (4) (811 SE2d 337) (2018). Accordingly,

8

we vacate the sentences imposed on aggravated battery and aggravated assault with intent to rob.[2]

Judgment affirmed in part and vacated in part. Hines, C. J., Melton, P. J., Benham, Hunstein, Nahmias, Blackwell, and Boggs, JJ., concur.

---

[2] A remand is unnecessary where we vacate counts upon which the defendant never should have been sentenced due to merger of counts. See Atkinson v. State, 301 Ga. 518, 521 (2) (801 SE2d 833) (2017).

Decided August 20, 2018.

Murder. Wayne Superior Court. Before Judge Wilkes.

Richard O. Allen, for appellant.

Jacquelyn L. Johnson, District Attorney, Andrew J. Ekonomou, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General, for appellee.